[No. 26706. Department Two. August 2, 1937.]

THE STATE OF WASHINGTON, *Respondent*, v. T. F. SEIDENSCHWARZ, *Appellant*.[1]

[1]Reported in 70 P. (2d) 780.

112

*Stimson & Donahue,* for appellant.

*Ralph E. Foley, C. C. Quackenbush,* and *Leslie M. Carroll,* for respondent.

ROBINSON, J.—This is an appeal from a conviction on an information containing three counts charging larceny in violation of Rem. Rev. Stat., § 2601 [P. C. § 8944], subd. 2.

The principal claim of error is based upon the fact that the trial court refused to direct a verdict for the defendant. There is a companion assignment to the effect that the court erred in refusing to set aside the verdict on the ground that the evidence was insufficient to justify it on any one of the three counts. There are also nine assignments raising questions of law, all relating to the admission or rejection of evidence. We regard these nine assignments as of slight importance. In so doing, we but follow appellant's example; for his briefs of nearly one hundred pages in volume contain but one legal citation, and it does not relate to these assignments.

The principal question to be determined on appeal is whether or not the state produced sufficient evidence to justify a conviction on the three counts of the infor-

mation. For the purpose of such an inquiry, we must assume that the story, as told by the state's witnesses and illustrated by its exhibits, is true, although it is highly reminiscent of the tales relating to the exploits of J. Rufus Wallingford and lacks but few of the elements essential to a moving picture scenario, being replete with tragedy, comedy, surprise, frustration, and romance.

The story revolves around the attempted promotion of a beryllium mine and opens on September 17, 1935. On that day, U. J. Beeghly gave to the appellant and John McChessney a letter which was subsequently signed by G. M. Myers. The letter, omitting formal parts, reads as follows:

"This will confirm our conversation of even date relative to the Muscovite Mica property near Avon, Idaho; owned jointly by G. M. Myers and myself, and at which time we agreed to make you a price of Fifty thousand ($50,000) dollars, NET to Us. Terms: Ten thousand ($10,000) dollars down, and balance on such terms as can be agreed upon by all parties concerned.

"I informed you today that we are in no position to grant you any definite or specific time in which to accept or reject this proposition, as we already have several prospects and brokers interested in the purchase and sale of the property. This makes it necessary that we keep it in the open market, and at the same time allows us to negotiate with any and all prospective buyers, or close a deal with another party at any time."

Plainly, the appellant received no interest whatever in the Muscovite mine through that instrument. He never received any other writing from Beeghly, and, although he claimed to have subsequently received permission from Myers to extract ore from the property, the letter, above quoted, was throughout his sole and only muniment of title.

In March, 1936, appellant made the acquaintance of

P. H. Briscoe, an electrician, who for about two years had been interested in a small mining corporation. The appellant informed Briscoe that he owned the Muscovite mine and an arrangement was made between them to organize a corporation to develop it. The terms are not fully shown in the record, but it appears that appellant assigned, or agreed to assign, to Briscoe a one-half interest in the mine. Briscoe, having owned stock in another mining corporation, was thought competent to draft the incorporation papers for the new company. He drew the articles, using the other company's as a model, furnished the filing and license fees, and paid other incidental expenses.

The corporation was organized under the laws of Idaho on September 18, 1936, with a capitalization of two million shares of the par value of two and one-half cents each. Briscoe subscribed for one million shares, appellant for ninety-nine thousand nine hundred and ninety shares, and "Jack" McChessney, whom appellant speaks of as his partner, made a prudent subscription for ten shares of a total par value of twenty-five cents.

The promoters contrived to interest other parties in the matter, and five directors were elected. At the first directors' meeting on September 25th, appellant and Briscoe, in due form, proposed to turn over to the corporation the following described property:

"The Muscovite mining property located in the county of Latah, state of Idaho, and about 7 miles northwest of the city of Deary, Idaho, with all the mineral rights and natural resources pertaining thereto; all of said lands and property being free and unencumbered;"

in payment of their stock subscriptions and on condition that the corporation should issue to them one million nine hundred and ninety-nine thousand and

ninety shares of "full paid nonassessable" stock, and promise to pay the appellant $100,000.25 in cash out of future earnings. This proposition was accepted by unanimous vote.

In the meantime, the appellant had put men to work extracting ore and transporting it to Deary, Idaho, where a small building was being erected to serve as a smelter. Money was needed to carry on these projects, and on October 6th, appellant and Briscoe each donated five hundred thousand shares of stock to the corporation's treasury, and the directors, by resolution, set aside two hundred fifty thousand shares to be sold to the public at ten cents per share; all moneys received from said sales to be put in the petty cash account. The record does not show how many shares were sold, but there was one sale of a block of twenty-five thousand shares for twenty-five hundred dollars, the corporation, however, agreeing, in writing, to return the money to the buyer from the profits of its smelter at Deary within twelve months.

Appellant seems to have played a minor part in the stock selling campaign. He did, however, negotiate a sale to Edward Pearson and wife for one hundred fifty dollars. Count two is based on this transaction, which occurred November 21, 1936. Appellant denied that he made any representations to the Pearsons other than that the stock was valuable and that there was no doubt but that it would be paying dividends within six months after the completion of the smelter. This might be dismissed as mere "seller's talk", especially since spoken of mining stock, but the Pearsons testified, and they were corroborated by another witness, that they insisted on knowing from the appellant as president of the company whether the title to the mine was secure, and appellant assured them that he and his partner McChessney were the sole owners.

In September, 1936, the appellant went to Bellingham, Washington, to consult Charles C. Berg, a metallurgical engineer of international reputation, and during October sent him several samples of ore for test purposes. The appellant reported to his associates that Mr. Berg had become so enthusiastic as a result of these tests that he had agreed to supply all necessary smelter machinery and equipment, and that, in due course, it would be shipped to Deary from Oakland, California; the corporation, however, to pay the freight. Mr. Berg was a witness at the trial and testified that he did not even discuss smelter equipment with the appellant.

On November 3rd, the directors refused to authorize the purchase of an automobile for appellant's use. Checks on the petty cash fund were required to be signed by appellant and the corporation's secretary. On November 14th, appellant procured a blank corporation check, on the representation that he needed an undetermined amount to pay freight on smelter equipment which had been shipped by Mr. Berg from Oakland and was due to arrive at any moment. He procured the signature of the corporation's secretary upon the same representation, and the next day filled in the check to the amount of $511.60 and used it as a partial payment on a new Packard car, taking the contract in his own name. Appellant claimed that the car was purchased for the corporation's use. Mrs. Bertha Passon, a widow and sister of one of the directors, testified that she went with the appellant to get the check, that the car was purchased for her own and appellant's honeymoon, and that appellant immediately, upon taking delivery, gave her the duplicate keys and said: "You learn to drive the car." The honeymoon, or rather that particular honeymoon, did not eventuate.

Within a week, the appellant found it necessary to

go east in the interest of the corporation. Four hundred dollars were advanced to him from the corporate treasury. He traveled by plane, leaving on November 22nd. He wired from Syracuse, New York, on November 24th, for an additional two hundred dollars, which was sent by draft. He wrote to Mrs. Passon and her brother from Syracuse, New York, on December 1st, saluting them as "Dear Bertha and Herman," reporting much progress in Boston, Washington, and New York, and intimating that he would be pressed for funds to make the necessary calls by plane in Cleveland, Pittsburgh, Chicago, Milwaukee, and Rockford, Illinois. He neglected to mention in his letter to Mrs. Passon that he had married a Syracuse widow several days before. The letter closes with this illuminating sentence concerning another widow:

"My cousin the widow wants to come out with me. I told her she could, and I hope she does as she has quite a little money and how I wish I had made this trip long before."

On December 2nd, he wrote to Briscoe from Syracuse, stating that he was "broke and stranded," having spent two hundred ten dollars in cash for plant equipment, and requested the immediate transmittal of three hundred dollars. On December 4th, he wired, increasing the demand to three hundred fifty dollars, and requested that McChessney be telephoned to take care of packages to arrive at Deary by express. The money was sent by wire.

In the meantime, rumors were flying about at a mining convention that appellant had no real interest in the Muscovite mine. These came to the attention of Briscoe, who, recollecting that appellant had evaded repeated requests to transfer title to the corporation, became alarmed. On December 4th, he wired appellant at Syracuse:

"Is Muscovite property title secure? Scott, representing Muscovite Mining Company, threatens to replevin ore at Deary . . . claim our titles no good," to which appellant immediately replied by wire:

"Why worry about claim, we are set OK," and by letter, stating vaguely:

"I can now pay the owners what they have coming under our contract and it will be their lookout to protect Jack and I."

Appellant and his bride arrived at Spokane on December 6th, appellant having been absent exactly fourteen days. In due time, he filed an expense account, amounting to $1,094.35, including hotel bills in New York, Washington, Cleveland, Pittsburgh, and Syracuse, and charges for transportation to Boston, Detroit, Pittsburgh, Milwaukee, and Rockford, Illinois. He testified at the trial that he was at Syracuse only a day and one-half, yet the record contains, as exhibits, his letters and telegrams from Syracuse dated November 24th, December 1st, 2nd, and 4th, and he was married to a resident of Syracuse on November 26th.

Appellant was charged with larceny by false representation. In count one, he was charged with the larceny from his own corporation of $511.60; in count two, with the larceny of one hundred fifty dollars from the Pearsons; and in count three, was charged with a second larceny from his own corporation in the amount of three hundred fifty dollars.

It is insisted, with especial emphasis, that the state's evidence in support of count three was insufficient. There was specific evidence that the corporation sent appellant three hundred fifty dollars upon his representation that he sorely needed it because he had expended two hundred ten dollars in the purchase of plant equipment, which, he intimated, would come

forward by express. Up to the time of trial, March 4, 1937, no plant equipment had been received from the east, and no express packages were received other than the trunks of appellant's bride. Appellant's expense account showed no item of two hundred ten dollars, and, with the exception of forty-two dollars, no other amount expended for plant equipment. He produced no receipt for cash spent in purchasing equipment. He had great difficulty in even naming the firms he called upon in the various cities he claimed to have visited, and for a time had difficulty in suggesting the name of the firm from which he claimed to have made the alleged purchase.

As a matter of fact, the jury might well have concluded from the appellant's oral evidence, when considered with his letters and expense account, that the corporation was defrauded of substantially all the money supplied to the appellant in connection with his trip east. Appellant left Spokane on November 22nd. He went directly to Syracuse, since he wired from there for money on November 24th. He married a resident of Syracuse on November 26th. His letter written to Mrs. Passon from Syracuse on December 1st shows that he had not yet visited Cleveland, Pittsburgh, Chicago, Milwaukee, or Rockford. His letter to Briscoe of December 2nd states that he was still at Syracuse, "stranded and broke." He remained so until he received the funds wired on December 4th.

His final letter to Briscoe is dated "Syracuse, December 4th, 10 P. M." He testified that he arrived in Spokane on the afternoon of December 6th, that is, in considerably less than forty-eight hours, and yet there are listed in his expense account items covering transportation to all of the cities above named; and in explaining an item of sixty-five dollars for "entertaining,"

he testified, on cross-examination, that he gave dinners in the corporation's interest at Pittsburgh, Rockford, and Chicago. If so, December 5th must have been a busy day indeed.

It is also strenuously urged that the verdict as to count one is against the law and the evidence. It is insisted that it appears from the only credible evidence that the Packard car was purchased for the corporation's use. There was considerable evidence to that effect, but there was also direct evidence to the contrary; and, while the fact that appellant was married to another women on November 26th might ordinarily be thought to cast some doubt upon the testimony of Mrs. Passon that appellant purchased a car to take her on a honeymoon trip only eleven days before, that inference was rather effectually foreclosed by the thirty-sixth and last exhibit introduced by the state. This was a certified copy of a judgment, sentence, and commitment of the superior court of Spokane county showing that appellant was, on December 16, 1932, sentenced to the Washington state penitentiary for the crime of bigamy. We think that the evidence was amply sufficient to sustain the verdict on all three counts.

It is assigned as error that the court refused to permit the appellant to ask Mr. Beeghly if he had not recently been negotiating with Briscoe for the sale of property, and that the court refused to allow Beeghly to be asked whether he prevailed in a suit instigated by him in Idaho charging the appellant with stealing ore; and it is also assigned as error that a payroll of the mine was not admitted. We think the court wisely exercised its discretion in refusing to permit counsel to go into these collateral matters and in confining the evidence to the issues in the case.

It is also assigned as error that the court did

not permit evidence as to conversations between appellant and one of the directors concerning the purchase of an automobile for appellant's use. If these rulings were in any way erroneous, the errors were cured, since that testimony was received later in the trial.

It is also alleged that the court erred in sustaining the objection to the following question put to Mr. Pearson:

"You would have bought the stock regardless of that statement, wouldn't you?"

The witness had been asked, and had answered, a series of argumentative questions along the same line, and the court at this point evidently thought that the matter had proceeded far enough.

It is further alleged that the court erred in allowing a witness, other than the Pearsons, to testify to statements made to him by appellant while attempting to sell stock. These statements were to the effect that "they" owned the mine and did not owe a dollar on anything, and that the ore was worth four hundred dollars per ton. This, in our opinion, is the only assignment with reference to evidence that has a semblance of merit. We think, however, the evidence was admissible under the decision in *State v. Schultz,* 168 Wash. 120, 10 P. (2d) 980, and cases therein cited.

Finally, an assignment is made based upon misconduct of counsel. The matters and things relied upon as constituting the alleged misconduct do not appear in the transcript or statement of facts, and, in fact, appear nowhere in the record. We can, therefore, take no notice of this assignment.

The judgment, sentence, and comitment from which this appeal was taken are in all respects affirmed.

STEINERT, C. J., HOLCOMB, BEALS, and GERAGHTY, JJ., concur.